UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT WOODS,                                              No. C-13-0309 EMC (pr)

        Petitioner,

    v.                                                            **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

G. SWARTHOUT, Warden,

        Respondent.

_____/

## I.    INTRODUCTION

Robert L. Woods filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner also filed the following motions: (1) for an extension of time to file his traverse; (2) to amend his petition; (3) to file an oversized traverse; (4) for an evidentiary hearing; and (5) to supplement his traverse. Respondent has not filed oppositions to Petitioner's motions. The matters are now before the court for consideration. For the reasons discussed below, the petition and motion for an evidentiary hearing will be denied and Petitioner's other motions will be granted.

## II.    PROCEDURAL BACKGROUND

Petitioner was charged by information with murder. The information further alleged that during the commission of the crime Petitioner personally used a knife. Petitioner pleaded not guilty and denied the knife-use allegation. A jury trial commenced on February 11, 2010. The jury found Petitioner guilty of second degree murder and found true the enhancement allegation that, during the commission of the murder, Petitioner personally used a knife. The trial court sentenced Petitioner to

**United States District Court**
For the Northern District of California

1  state prison for fifteen years to life on the second degree murder conviction, plus a consecutive one-

2  year term on the knife use enhancement.

3  Petitioner timely appealed to the California Court of Appeal where he raised two claims:

4  (1) the trial court violated his Sixth Amendment right to a jury trial and Fourteenth Amendment

5  right to due process by precluding the defense from questioning prospective jurors about a heat of

6  passion defense; and (2) the trial court violated his right to due process by permitting a key defense

7  witness to be impeached with a twenty-year old prior theft conviction.  *See* Resp. Ex. D at 13, 28.

8  On September 23, 2011, in a written opinion, the California Court of Appeal affirmed the judgment.

9  *See* Resp. Ex. F, *People v. Woods*, 2011 WL 4431019 (Cal. App. Sept. 23, 2011) (unpublished).  On

10  October 27, 2011, Petitioner filed a petition for review in the California Supreme Court, seeking

11  review of the Court of Appeal's ruling.  *See* Resp. Ex. G.  On December 21, 2011, the California

12  Supreme Court summarily denied the review petition.  *See* Resp. Ex. H.

13  On September 10, 2012, Petitioner filed a petition for a writ of habeas corpus in the

14  California Supreme Court, raising three claims: (1) ineffective assistance of counsel based on

15  counsel's failure to conduct investigations, present mitigating evidence and present defenses;

16  (2) insufficient evidence of malice; and (3) violation of Petitioner's Sixth Amendment right to an

17  impartial jury.  *See* Resp. Ex. I.

18  On October 22, 2012, the California Supreme Court received, but did not file, Petitioner's

19  "supplemental writ of habeas corpus."  *See* Resp. Ex. J.  In this supplemental filing, Petitioner raised

20  three additional claims: (1) prosecutorial misconduct based on misstating the law on "heat of

21  passion;" (2) judicial misconduct; and (3) ineffective assistance of counsel based on counsel's

22  failure to object to the prosecution's misstatement of the law pertaining to "heat of passion."  *See*

23  Resp. Ex. J at 3, 5, 11-12.  On December 12, 2011, the California Supreme Court, without comment,

24  denied the petition for a writ of habeas corpus.  *See* Resp. Ex. L.

25  On January 23, 2013, Petitioner filed the instant petition for a writ of habeas corpus, in which

26  he asserted all of the claims he presented to the California Court of Appeal and California Supreme

27  Court on direct appeal and collateral review, and the claims he attempted to present in his

28  supplemental petition.

**United States District Court**
For the Northern District of California

### III.   PRELIMINARY MATTERS

A.   Motion to Amend Petition

On September 3, 2013, Petitioner filed a motion to amend his petition and clarify issues.  In this motion, Petitioner seeks to withdraw the following claims: (1) insufficient evidence of malice; (2) prosecutorial misconduct based on misstating the law on heat of passion; (3) ineffective assistance of counsel based on failure to object to the prosecutor's misstatement; and (4) judicial misconduct based on the trial court's failure to correct the prosecutor's misstatement.  It is unclear whether Petitioner wishes to withdraw his Sixth Amendment claim based on a tainted jury pool because he includes it in the list of claims he wishes to pursue, but it is crossed out.  The Court grants Petitioner's motion to amend his petition and withdraw claims.  The four withdrawn claims will not be addressed by the Court.  Because it is unclear whether Petitioner intends to withdraw the Sixth Amendment claim based on a tainted jury pool, the Court will address it.

B.   Other Motions

Petitioner filed motions for an extension of time to file his traverse, to file an oversize traverse, and to supplement his traverse in support of his ineffective assistance claims.  These unopposed motions are granted.

Petitioner also filed a motion for an evidentiary hearing.  For the reasons discussed below, this motion will be denied.

### IV.   FACTUAL BACKGROUND

The California Court of Appeal found the facts of Petitioner's offenses as set forth below.  This summary constitutes a factual finding that is presumed correct under *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

**A. Prosecution Case**

Defendant and Elnora Caldwell were married in 2002.  Defendant cheated on Caldwell with other women during the marriage.  On May 23, 2008, Caldwell was granted a five-year restraining order and defendant was ordered to stay at least 100 yards away from Caldwell and her Oakland residence.

Despite the restraining order, Caldwell's son, Nolan Lewis, heard defendant at the front door of his mother's Oakland apartment several times yelling for Caldwell to open the door.  Around June 2008, Eugene Danezlar began a romantic relationship with Caldwell.  Occasionally while at Caldwell's apartment Danezlar heard knocking

United States District Court

For the Northern District of California

on her bedroom window. Once when police came to the apartment to investigate an incident, Danezlar saw a black pickup truck with a loud muffler system drive past the front of the apartment. Defendant had such a vehicle.

On October 6, 2008, at approximately 11:00 p.m., Oakland Police Officer Chris Craig received a report of a restraining order violation. Craig made contact with defendant by phone. Defendant admitted the violation, but explained he ran into Caldwell in a bar and was trying to reconcile with her. She eventually borrowed his cell phone to call police because she felt he was harassing her and violating the restraining order. He handed her the phone not expecting she would actually call the police. Defendant told Craig he did not know Caldwell's telephone number or where she lived.

On October 25, defendant was staying at his friend Reginald Allen's studio apartment, sleeping on his couch, and paying Allen a little bit of money for the favor. He had been staying there for a week or two. Although Allen knew defendant owned a black pickup truck, the previous day he had parked a rental car at Allen's home.

About 3:30 or 4:00 p.m. on October 25, Allen ran into defendant in front of Allen's building. Defendant was upset and crying and "complaining about nothing's going well. Everything's just not going right." He told Allen he missed Caldwell and wanted her back. Defendant asked Allen to do a favor for him. He had bought a necklace for Caldwell, and asked Allen to go to her apartment and give the necklace to her. Defendant gave Allen her address and apartment number, and told him to get Caldwell to return with him so defendant could talk to her. Allen went to Caldwell's residence, knocked on the door, and gave her the boxed necklace. He told her how defendant was feeling and also that he wanted to see her. She became concerned and asked Allen to take her to defendant. Allen drove her back to his residence. Defendant was waiting there in his truck. Before going inside his residence, Allen saw Caldwell get into the truck with defendant.

About 6:00 p.m. on October 25, 2008, Richard Mazzera was driving on Fish Ranch Road in Berkeley, above the Caldecott Tunnel, when he saw a black pickup truck parked on the side of the road with its passenger door ajar. As Mazzera slowed down, thinking he might stop and offer assistance, he saw a middle-aged African–American couple in the truck. It appeared to Mazzera the couple was arguing and the woman, later identified as Caldwell, had her hands in the air. Thinking the argument might escalate into something worse, Mazzera thought he should get the truck's license plate number and let them know he was present. After pulling alongside, he slowly backed up so he could see the license plate. From that position, Mazzera could see the couple was "really arguing," and it looked like the man, later identified as defendant, was "thrusting" and "punching" or "striking" the woman. She had her arms up as the man "was being violent toward her." Mazzera watched as the man slid the woman out of the truck and "shove[d] her away."

The woman walked on the passenger side of the truck toward the rear, toward Mazzera saying, "Help me," in a pleading voice. Mazzera could see she was bloody. Before she could reach Mazzera's vehicle she fell face first onto the concrete between the two vehicles, and was motionless. Mazzera realized other people had stopped behind him on the street. He heard a woman's voice scream, "Stop, stop," and then saw defendant pulling away in his truck. Thinking one of the other persons present at the scene could attend to Caldwell, Mazzera took off to follow defendant's truck.

Martin Reed was driving with his sister and nephew on Fish Ranch Road at 6:00 p.m. on October 25 when he saw a black pickup truck parked on the side of the road with a woman falling out of it. He pulled up ahead of the truck and could see the woman

4

United States District Court
For the Northern District of California

collapse facedown on the road in his rear-view mirror.  Reed got out of his vehicle and went to see if he could help the injured woman.  She was bleeding from the neck and coughing up blood.  Reed asked Caldwell who had done this to her, and both he and another person at the scene felt she was trying to say, "My husband."  Caldwell eventually lost consciousness.  A doctor who came by tried to resuscitate her, but she died before an ambulance arrived.

Mazzera stayed with defendant as he was driving at a high rate of speed along Grizzly Peak Boulevard.  Mazzera was trying unsuccessfully to reach the police via his cell phone.  At one point defendant pulled over and waved for Mazzera to pass him, but Mazzera stopped a safe distance back and waited for defendant to move.  Defendant eventually pulled out and drove on, with Mazzerra following.  On a straight portion of the road, Mazzera saw defendant throw things out of the side of his truck.  It looked like a purse and some papers.  The chase continued at speeds up to and over 90 miles per hour until defendant reached a highway and Mazzera lost sight of him.

Nolan Lewis came by his mother's apartment sometime after 6:00 p.m. on October 25 to say hello and pick up a jacket.  He saw defendant circle the block three times in his truck before parking in Caldwell's driveway and entering her apartment.  Knowing about the restraining order, Lewis found it odd defendant was there, and followed him in.  Lewis saw defendant washing his hands in his mother's bathroom.  He dialed 9–1–1 on his mother's telephone and then put the phone down.  He went to the bathroom and said, "So you're in my mom's fucking house now?"  Defendant moved fast at that point to leave the apartment, telling Lewis, "Oh, your mother's down the hill," which Lewis interpreted to mean she was a few blocks away on Grand Avenue.  Angry over defendant's invasion of his mother's privacy and violation of the restraining order, Lewis grabbed a chair and used it to break one of the windows on defendant's truck as he drove off.

At 7:00 p.m. on Grand Avenue, defendant walked up to a parked police car, and told the officers inside, "I think I need to be arrested."  When one of the officers asked why, he told them in a calm, detached tone of voice, "I think I may have just committed murder."  Defendant was immediately arrested.

A police search of Caldwell's residence showed a telephone off its hook, a cell phone on the counter in the bathroom, and a set of keys to the apartment with blood on them.  The police found blood on the bathroom sink counter and blood on a washcloth sitting behind the faucet.  A search of the area where Mazzera had seen defendant toss things from the truck turned up Hallmark greeting cards and a cell phone charger with blood stains on them.  No purse or bag was found.

The autopsy of Elnora Caldwell showed she had sustained seven stab wounds.  One wound to the right side of her neck below her earlobe had penetrated her right external carotid artery.  Another wound near the center of Caldwell's chest had gone three and one-half inches deep, penetrating the right ventricle of her heart.  Caldwell suffered other stab wounds to the inner right breast, upper right chest, upper left abdomen, upper right arm, and right forearm.  She also had faint scrapes on her neck consistent with the blade of a knife having been held up against her throat.  She bled to death from the combination of the wounds to her carotid artery and heart.

In its closing argument, the prosecution asked the jury to find defendant guilty of first degree murder or, if it could not find premeditation and deliberation beyond a reasonable doubt, for a verdict of second degree murder.

**United States District Court**
For the Northern District of California

**B. Defense Case**

Defendant conceded he had killed Caldwell, but argued he was guilty of only voluntary manslaughter.

Defendant testified on his own behalf.  He met Caldwell in 1996.  They had developed a strong romantic bond, and lived together for a couple of years before getting married in 2002.  They maintained separate residences after getting married.  Defendant and Caldwell had many common interests and were physically very affectionate and passionate with one another.  Defendant admitted he had one "quick fling" with another woman in 2003, and Caldwell eventually found out about it.

When Caldwell broke off their relationship in 2008, defendant desperately tried to reconcile with her.  In April 2008, he went to the Nordstrom department store in San Francisco where Caldwell worked to talk to her.  On May 2, 2008, he waited for Caldwell at the Powell Street BART station after work and again tried to talk to her.  He got onto a BART train with her even though she told him she did not want to talk.  On May 9, 2008, defendant was served with notice Caldwell was seeking a restraining order against him.  After that, defendant did not see Caldwell again until August 2008.

In August, defendant saw Caldwell standing at a bus stop.  He stopped and asked her if she needed a ride.  She smiled and nodded and got into his vehicle.  They parked a few blocks away and talked for awhile after which he dropped her at a location where she was meeting her friend.  Later that evening, defendant ran into Caldwell and her friend at a bar in Oakland.  They talked pleasantly and he eventually offered her a ride home when the bar was closing.  After dropping Caldwell's friend off in Berkeley, defendant and Caldwell returned to his apartment where they had consensual sex.  Following that incident, the two had consensual sex two more times in September, initiated in both cases by Caldwell contacting defendant.

In October 2008, defendant ran into Caldwell in a bar.  He tried talking to her, but she was upset with him because he had broken her screen door the last time he went to her house in an attempt to talk to her.  Caldwell asked defendant how he would feel if she were to call the police.  He did not believe she would, so he handed her his cell phone and told her he would leave if she made the call.  She proceeded to call the police, and gave the phone back to defendant.  He left and later that evening a police officer obtained his telephone number from dispatch and called him.  He admitted violating the restraining order.

Several days later, defendant had a friend of his deliver an envelope to Caldwell containing $100 to fix a lock she believed he had broken on her security gate, along with a new dead-bolt lock and Caldwell's new medical insurance card (because she was getting her medical coverage through his employment).

Defendant had been employed by the City of Oakland for 15 years prior to his arrest.  FN1  During the summer of 2008, he began having serious financial difficulties with the Internal Revenue Service (IRS) due to unpaid back taxes.  The IRS began garnishing a substantial amount of defendant's wages in October 2008.  As a result, defendant could no longer pay his apartment rent and became homeless.  He began living out of his truck and occasionally sleeping on friends' couches.  He kept a kitchen steak knife in his truck for protection when he was sleeping in the truck.  He also purchased "super" burritos to eat late at night and would use the knife to cut them in half.

**United States District Court**

For the Northern District of California

FN1. Defendant had been suspended without pay from his job from January to April 2008.

Due to his personal and financial problems during this time period, defendant was anxious, angry, confused, and depressed. He was worried and scared, and not sleeping well.

A friend of defendant's, Louis Griffin, testified he asked defendant to help him move his belongings to a new apartment. Griffin remembered the move took place on a Wednesday night, starting between 7:30 and 8:30 p.m. They had loaded defendant's truck and defendant was driving them to Griffin's new residence when defendant saw Caldwell standing on the street and asked her if she wanted a ride. She hesitated for a second, but agreed and got into the front passenger seat next to defendant. Defendant drove to Caldwell's house, parked, and walked her home while Griffin waited in the truck. Defendant came back more than an hour later looking very happy. FN2 He told Griffin everything was going to be okay and he and Caldwell were going to get back together.

FN2. Defendant testified he and Caldwell stood outside her apartment and spoke for about 20 minutes.

Defendant testified that on October 23, 2008, the day after helping Griffin move, he went to a jewelry store in San Francisco to buy Caldwell an anniversary present. He bought her a crystal bracelet costing more than $250 to match a crystal necklace he had purchased for her the year before. He also bought several anniversary cards for her. On one of them he had written: "Baby, my love, you and only you taught me to love and forgive, and most of all, love in spite of. You're the only one in my world. R. Woods. Baby, please be mine." On another he wrote: "Baby love, '08, please come back home. R. Woods."

On October 25, 2008, defendant's friend, Reginald Allen, delivered the bracelet and cards to Caldwell at her apartment. Defendant was surprised when Allen returned with Caldwell, but he was happy to see her. At first, they sat in his truck and had a cordial conversation. Caldwell took the bracelet out of the box and defendant helped her put it on her wrist. Eventually they started driving around. Defendant could not recall the locations they went to although he remembered Sequoia Lodge because it was one of the places where he and Caldwell had sex on a prior occasion.

Eventually they ended up at the Fish Ranch Road location. They were still driving when Caldwell suddenly took the bracelet off and threw it at defendant. She yelled at him, "Here, you probably just took your dick out of a bitch last night." She also called him a "dog ass motherfucker" twice. Defendant stopped the car and was trying to understand what was happening. He was trying to calm her down. At some point, he "snapped," he "lost it." The words "went right through" him and rattled him. He became enraged and grabbed the kitchen knife he had in the truck, and began stabbing her.

Defendant could only recall parts of what happened after that. He was scared and he took off up the hill. He did not remember throwing objects from his truck. He did not know why he went to Caldwell's apartment: "At first I didn't know. I mean, I didn't know. I just saw the keys and I made the decision to go over there. And while I was over there I thought about a time—I thought about there possibly being another man. And there was times—there was one time when she had some rubbers in her drawer, and I thought about that time." Defendant went through Caldwell's underwear drawer before going to the bathroom to wash his hands. He left when Caldwell's son

confronted him, got into his truck, drove a short distance to Grand Avenue, and turned himself in when he saw a police car because he knew he had done something terrible and had to face it.  He told the officer, "I think you need to arrest me.  I think I hurt my wife real bad."

Ex. F at 2-8.

## V.   JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the execution of a sentence for a prisoner incarcerated in Monterey, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## VI.   EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  28 U.S.C. § 2254(b), (c).  The exhaustion-of-state-remedies doctrine reflects a policy of federal-state comity to give the state "the initial 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'"  *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citations omitted).  The parties do not dispute that the claims that remain in the "amended petition" are exhausted.

## VII.   STANDARD OF REVIEW

A federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

1 a decision that was based on an unreasonable determination of the facts in light of the evidence

2 presented in the State court proceeding."  28 U.S.C. § 2254(d).

3       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

4 arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

5 state court decides a case differently than [the] Court has on a set of materially indistinguishable

6 facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

7       "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

8 state court identifies the correct governing legal principle from [the] Court's decisions but

9 unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal

10 habeas court may not issue the writ simply because that court concludes in its independent judgment

11 that the relevant state-court decision applied clearly established federal law erroneously or

12 incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court

13 making the "unreasonable application" inquiry should ask whether the state court's application of

14 clearly established federal law was "objectively unreasonable."  *Id.* at 409.

15       Where Supreme Court precedent gives no clear answer to the question presented, "it cannot

16 be said that the state court unreasonab[ly] appli[ed] clearly established Federal law."  *Carey v.*

17 *Musladin*, 549 U.S. 70, 77 (2006); *see also Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009)

18 (federal habeas court must defer to the state court's decision when no Supreme Court decision

19 squarely addresses the issue in the case or establishes a legal principle that clearly extends to a new

20 context).

21       "Factual determinations by state courts are presumed correct absent clear and convincing

22 evidence to the contrary."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

23       If constitutional error is found, habeas relief is warranted only if the error had a "'substantial

24 and injurious effect or influence in determining the jury's verdict.'"  *Penry v. Johnson*, 532 U.S.

25 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

26       When there is no reasoned opinion from the highest state court to consider the petitioner's

27 claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state

28 judgment was erroneous under the standard of § 2254(d).  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06

United States District Court

For the Northern District of California

(1991).  In the present case, the California Supreme Court summarily denied Petitioner's petition for review.  The California Court of Appeal, in its opinion on direct review, addressed the first two claims Petitioner raises in his federal petition.  Thus, the Court of Appeal is the highest court to have reviewed these claims in a reasoned decision, and it is that decision that this Court reviews.

When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state-court decision is objectively reasonable.  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  This "[i]ndependent review is not a *de novo* review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable."  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

## VIII.    DISCUSSION

A.     Questioning Prospective Jurors Regarding "Heat of Passion"

At trial, Petitioner conceded that he killed his estranged wife, Elnora Caldwell, but argued that he only was guilty of voluntary manslaughter, not murder.  Ex. F at 5.  The trial court instructed the jury that a murder conviction requires the trier of fact to find that the defendant killed with "malice aforethought," but malice aforethought does not exist if the killing occurred "upon a sudden quarrel or heat of passion."  Ex. C., Reporter's Transcript ("RT") at 428, 430-31.  Petitioner contends that the trial court violated his Sixth and Fourteenth Amendment rights to an impartial jury and a fair trial when it precluded his defense counsel from questioning the prospective jurors during voir dire about whether they would have difficulty following the court's instructions regarding "heat of passion killings."  Pet'n at 6, 22-34.

///

///

///

///

United States District Court

For the Northern District of California

1.      Court of Appeal Opinion

The Court of Appeal addressed this claim as follows:

**1. Facts**

During jury voir dire, defendant's trial counsel attempted to question a prospective juror about whether the juror would be able to follow the court's instructions regarding heat of passion killings.  The following exchange took place:

"[DEFENSE COUNSEL]: Okay.  There's something further that I didn't bring up yesterday, but this may very well become part of the case.  Not only is the prosecution required to prove each element beyond a reasonable doubt, if there is a showing that the incident, the offense, was committed in the heat of passion, then not only does the prosecutor have to prove the elements of the crime of murder, they have to prove beyond a reasonable doubt that the offense was not committed in the heat of passion.

"[PROSECUTOR]:  Objection, Your Honor.

"THE COURT:  I think we're pre-trying the case at this point

"[DEFENSE COUNSEL]:  Can you follow that law? Meaning—

"[PROSECUTOR]:  Objection. Your Honor.

"THE COURT:  Counsel, let's stay away from the facts of the case.

"[DEFENSE COUNSEL]:  If that instruction is given can you follow that?

"[PROSPECTIVE JUROR]:  Which instruction is given?

"[DEFENSE COUNSEL]:  If the instruction that the prosecutor is required to prove beyond a reasonable doubt that it was not committed in the heat of passion.

"THE COURT:  Okay. Let's be more general, if she can follow the law."

Later, out of the presence of the venirepersons, defense counsel asked the court to reconsider its ruling that he could not question prospective jurors specifically about their ability to follow heat of passion instructions.  Counsel explained he did not intend to pre-instruct the jury on any facts or suggest any conclusions, but he did want to explore whether prospective jurors had "strong feelings about the idea of killing somebody, and that there not being any lesser offenses, that a killing is a killing, a murder is murder, . . . and that to reduce it to manslaughter is not something that they're inclined to do."

The trial court rejected counsel's request, explaining jury voir dire is limited by law to determining whether there is a basis for a "for cause" challenge to a prospective juror.  The court stated it would be acceptable to ask prospective jurors "broadly" if they will follow the law with regard to any lesser offenses, but inquiring about specific defenses is inappropriate because that would be asking them "to pre-try what the result is going to be, . . . whether or not they'll vote for a particular verdict." According to the court, allowing questioning about a specific lesser offense would require pre-instruction: "[W]e have to instruct them on what that [lesser offense] really means, and then we're going to spend an hour trying to instruct them on what

heat of passion is, as opposed to voluntary manslaughter. . . . [V]oir dire is not the appropriate time for this.  And by just using the label it's meaningless to a jury, because saying heat of passion is truly meaningless to a jury who doesn't know what that means legally."

Voir dire continued the following day, and at one point Prospective Juror No. 57 volunteered to the court she would have difficulty accepting evidence the killing was done in a fit of passion: "[Prospective Juror No. 57]: . . . Something was said yesterday, the defense attorney said something that only came up once, something about something done in a fit of passion. . . .That wouldn't fly very well with me. . . . I don't cater to something like that, you know, I mean, I just don't believe in it. I believe you have to control yourself to not hurt your ownself [sic ] or someone else." At defense counsel's request, the trial court excused Prospective Juror No. 57 for cause.

After the prospective juror was excused, defense counsel renewed his request to voir dire prospective jurors regarding whether they would be open to receiving evidence of a killing committed in the heat of passion.  He argued the excused prospective juror personified his concern that some jurors do not believe in the heat of passion defense.  The court again rejected counsel's request in relevant part as follows:  "The heat of passion is a term of art. And I think . . . if you asked anyone of the people in this audience what heat of passion meant you would get that many answers to what that meant.  And none of them would be the correct legal definition of it.  In order to educate this jury about what heat of passion means in a legal sense we would have to go through the instruction, and each of you would argue your points, without any evidence having been taken.  Voir dire is not . . . the appropriate time to instruct them on the law. . . . The obligation of the jury is to follow the law as the Court states it to them.  I believe that it is a proper inquiry to ask them will they follow the law, even though they may disagree with it? . . . There are many laws that people do disagree with but they will follow it because they believe in the structure and the system. . . . Heat of passion voluntary manslaughter falls in that category.  I am happy to let you inquire whether or not they will follow the law as to any lesser offenses that they are instructed upon."

At the sentencing hearing, defendant's trial counsel filed a new trial motion on the grounds the court's ruling precluding voir dire of prospective jurors regarding the issue of "heat of passion" violated defendant's Sixth and Fourteenth Amendment rights.  The trial court denied the motion, citing the reasons previously stated on the record.

**2. Applicable Law**

"[T]he right to unbiased and unprejudiced jurors [has long been held to be] an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution.  Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored.  Without adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.  Yet, trial courts have great latitude in deciding what questions should be asked on voir dire."  (*People v. Earp* (1999) 20 Cal. 4th 826, 852.)

Voir dire in criminal cases is governed by Code of Civil Procedure section 223, which provides in relevant part as follows:  "In a criminal case, the court shall conduct an initial examination of prospective jurors.  The court may submit to the prospective jurors additional questions requested by the parties as it deems proper.

United States District Court

For the Northern District of California

Upon completion of the court's initial examination, counsel for each party shall have the right to examine, by oral and direct questioning, any or all of the prospective jurors.  The court may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors by counsel . . . . Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause.  The trial court's exercise of its discretion in the manner in which voir dire is conducted, including any limitation on the time which will be allowed for direct questioning of prospective jurors by counsel and any determination that a question is not in aid of the exercise of challenges for cause, shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

A trial court has broad discretion in deciding what questions should be asked during voir dire.  (*Mu'Min v. Virginia* (1991) 500 U.S. 415, 424; *People v. Earp*, 20 Cal. 4th at 852.)  To be constitutionally compelled, it is not enough that particular questions might be helpful.  Rather, the trial court's failure to ask the questions must render the defendant's trial fundamentally unfair. (*Mu'Min v. Virginia*, at 425–426; *People v. Holt* (1997) 15 Cal. 4th 619, 661.)

A "[d]efendant ha[s] no right to ask specific questions that invite [ ] prospective jurors to prejudge [an issue] based on a summary of the . . . evidence [citation], to educate the jury as to the facts of the case [citation], or to instruct the jury in matters of law." (*People v. Burgener* (2003) 29 Cal. 4th 833, 865.)  Subject to that limitation, either party is entitled to ask prospective jurors questions specific enough to determine if those jurors harbor bias that would cause them not to follow an instruction on the issues presented in the case.  (*See People v. Coffman and Marlow* (2004) 34 Cal. 4th 1, 47.)

## 3. Analysis

Defendant's voir dire argument does not depend on distinguishing this case factually or legally from any other murder case in which the jury is to be instructed on the lesser offense of voluntary manslaughter based on heat of passion.  Thus, he is arguing it is constitutional error as a matter of law in all such cases to prevent the defendant from asking prospective jurors whether they could follow the law regarding heat of passion.  We note as an initial matter defendant cites no case, state or federal, holding or suggesting the risk of juror bias on this issue is so substantial that courts should have no discretion to prevent inquiry about it during voir dire.

Defendant cites cases involving proposed voir dire questions on other legal issues.  Each case concerns relatively simple factual or legal predicates that could be understood by prospective jurors without a lengthy exposition of the evidence or instructions to be offered at trial.  (*See People v. Ábilez* (2007) 41 Cal. 4th 472 [holding it was proper for prosecutor to ask prospective jurors whether they had developed any principled reservation about voting for death after filling out their questionnaires and undergoing voir dire]; *People v. Cash* (2002) 28 Cal. 4th 703 [trial court erred in barring defense counsel from inquiring whether prospective jurors would automatically vote for the death penalty if defendant had previously committed murder]. . . . FN4

. . .

      FN4. The "heat of passion" instructions given in this case were quite lengthy and elaborate: "To reduce an unlawful killing from murder to manslaughter upon the ground of sudden quarrel or heat of passion the provocation must be

United States District Court

For the Northern District of California

of the character and degree as . . . naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion.  The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances.  A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted him were such as would have aroused the passion of the ordinarily reasonable person faced with the same situation. . . .

Defendant sees no such complication in asking jurors for their views about heat of passion" killings.  He places special reliance on *People v. Williams* (1981) 29 Cal. 3d 392, which held the trial court erred in refusing to allow the defendant to ask prospective jurors whether they would willingly follow an instruction to the effect that a person has a right to resist an aggressor by using necessary force and has no duty to retreat.  (*Id.* at 398, 412.) . . . .

Defendant's reliance on *Williams* is unpersuasive for a number of reasons.  First, we simply do not agree it would be practical to ask jurors about their "general attitudes" toward the concept of a killing in the heat of passion.  The words have a special legal meaning that required several paragraphs of instructions from the court to explain.  Prospective Juror No. 57 voiced reservations about excusing harmful acts because they were "done in a fit of passion," but we have no way of knowing whether Prospective Juror No. 57 understood the "heat of passion" doctrine does not exonerate a defendant charged with an unlawful killing, or that it is not the defendant's emotions that determine its application, but the manner in which an ordinarily reasonable person in his place would have reacted to the same circumstances.  Without carefully pre-instructing the prospective jurors about the law on this subject, a juror's "general attitude" about it provides no useful information about possible bias or difficulty following the instructions.

Second, in *Williams*, the court had before it the particular question defense counsel sought to ask of prospective jurors and was therefore in a position to evaluate whether the question would have required pre-instructing the jury or delving into the evidence to be presented.  Here, defendant never articulated specific questions he wanted to ask during voir dire, and has still not done so. . . .

. . .

The trial court did not abuse its discretion or violate defendant's rights under the Sixth or Fourteenth Amendments by precluding voir dire questions specific to whether prospective jurors would have difficulty following legal instructions pertaining to heat of passion killings.

Ex. F at 9-17.

    2.   <u>Analysis</u>

The United States Supreme Court has held that adequate voir dire is one component of the Sixth Amendment right to an impartial jury.  *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992); *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).  However, only two

specific inquiries are constitutionally compelled during voir dire: (1) inquires into a juror's racial prejudice against a defendant charged in a violent crime against a person of a different racial group, *see Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991); and, in a capital case, (2) inquiries into a juror's views on capital punishment, *see Morgan*, 504 U.S. at 730. Neither one is applicable here. To sustain a federal constitutional violation, it is not enough that requested voir dire questions might have been helpful; instead, a federal court is limited to determining whether the trial court's failure to ask certain questions on voir dire rendered the trial fundamentally unfair. *Mu'Min*, 500 U.S. at 425-26 (1991); *see also Harrington*, 131 S. Ct. at 786 (it is not an unreasonable application of established federal law for a state court to decline to apply a legal rule that has not been squarely established by the Supreme Court).

Petitioner argues that the Court of Appeal's rejection of his claim was an unreasonable application of *Morgan, Mu'Min* and *Aldridge v. United States*, 283 U.S. 308, 310 (1931). However, he does not specify exactly how these cases were not reasonably applied by the Court of Appeal. *Morgan* addressed a death penalty issue and held that the defendant had a right to challenge for cause potential jurors who would unwaveringly impose the death penalty after a finding of guilt and, to discover those jurors, the defendant had a right to question them on this issue during voir dire. *Id.* at 733. *Morgan's* holding regarding a death penalty issue does not stand for the proposition put forward by Petitioner, that he has a constitutional right to question the jurors regarding their belief that an individual could kill another person in a "heat of passion."

*Mu'Min* is even less helpful to Petitioner. *Mu'Min* addressed the defense request to question jurors during voir dire about the specific content of what they had read in the newspapers about the defendant's trial, even though the trial court had extensively questioned them about how the pretrial publicity affected them. 500 U.S. at 417. The Supreme Court noted that, "if counsel were allowed to see individual jurors answer questions about exactly what they had read, a better sense of the juror's general outlook on life might be revealed, and such a revelation would be of some use in exercising peremptory challenges. But, since peremptory challenges are not required by the Constitution, this benefit cannot be a basis for making 'content' questions about pretrial publicity a constitutional requirement." *Id.* at 425-26 (internal citation omitted). Therefore, *Mu'Min* does not

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  stand for the proposition that asking questions on voir dire regarding jurors' beliefs about the heat of

2  passion defense is a constitutional requirement.

3        In *Aldridge*, the Court held that it was unconstitutional for the trial court to have prevented

4  the defense from questioning members of an all-white jury if they could be impartial in judging an

5  African-American defendant who was being tried for the first-degree murder of a white victim. 283

6  U.S. at 309, 314. In making this ruling the Court took into account the many instances where the

7  right to examine jurors as to their state of mind with respect to African Americans and other races

8  had been upheld and the fact that "the possibility of racial prejudice" is not so remote as to justify

9  the risk in forbidding the inquiry. *Id.* at 313-14.

10        Unlike the defendant in *Aldridge*, Petitioner can point to no other case holding that the

11  Constitution requires that potential jurors be questioned regarding their feelings toward a heat of

12  passion defense.

13        Citing *United States v. Jones*, 722 F.2d 528, 529-30 (9th Cir. 1983) and *United States v.*

14  *Allsup*, 566 F.2d 68, 70 (9th Cir. 1977), Petitioner argues that the heat of passion defense is similar

15  to the insanity defense and federal courts have required voir dire on prospective jurors' ability to

16  fairly evaluate evidence of insanity or lack of mental capacity. These cases do not aide Petitioner.

17  First, they are issues that came before the court on direct appeal rather than in a habeas proceeding.

18  As explained by the Supreme Court, its cases dealing with the requirements of voir dire are of two

19  kinds, those that were tried in federal courts and subject to the Court's supervisory power, and those

20  that were tried in state courts, where the Supreme Court's authority is limited to enforcing the

21  Constitution. *Mu'Min*, 500 U.S. at 422. Because *Jones* and *Allsup* were tried in federal court, the

22  Ninth Circuit did not address the constitutional aspects of the voir dire issues. Second, although the

23  *Jones* court recognized that specific voir dire questions on an insanity defense was likely to discover

24  a likely source of prejudice because it is commonly known that the public "harbors strong feelings"

25  about it, it ruled that specific voir dire questions were not necessary about the defendant's coercion

26  defense, because it was more like that of self-defense, which did not fall within any of the three

27  recognized classes of bias. *Jones*, 722 F.2d at 530. A heat of passion defense, like the defenses of

28  coercion and self-defense, does not fall within any recognized class of bias.

United States District Court

For the Northern District of California

*Allsup* also does not assist Petitioner.  In *Allsup*, there was no dispute that the defendant had a right to question jurors about his insanity defense and, thus, the court did not analyze the issue. 566 F.2d at 70.  Therefore, the case sheds little light on whether questioning jurors about an insanity defense extends to a heat of passion defense.

Both Petitioner and Respondent cite *People v. Williams*, 29 Cal. 392 (1981) in support of their respective arguments.  However, an analysis of state law is not relevant in this federal habeas proceeding which is concerned only with violations of the United States Constitution and federal law.

Furthermore, in Petitioner's case, the trial court did not absolutely prohibit inquiry into the jurors' attitudes toward following the law.  It allowed the general question about whether the jurors would follow the law as given to them on any lesser included offense, even if they disagreed with it. Although Petitioner asserts that not allowing him to question the jurors specifically about their ability to follow the law on his heat of passion defense was a denial of his constitutional rights, he has not shown how his case is similar to the Supreme Court cases holding that the Constitution requires questioning jurors about their racial bias and their bias in favor of or against capital punishment.  As stated above, the purpose of voir dire is to obtain an impartial jury, not one which will vote in favor of acquittal.

Accordingly, the state Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

B.       Impeachment of Defense Witness

Petitioner contends the state trial court violated his due process rights by permitting the prosecution to impeach defense witness Louis Griffin with Griffin's 1989 conviction for a theft-related crime, after which he led a legally blameless life.

1.       Background

The California Court of Appeal summarized the facts of this claim as follows.

Defendant moved in limine for an order precluding his witnesses from being subject to impeachment based on prior felony convictions or other conduct.  At the hearing on the in limine motions, the prosecutor advised that the only defense witness with a prior felony conviction was Louis Griffin, who had a 1989 felony grand theft conviction.  Defense counsel argued the conviction had little probative value for

United States District Court
For the Northern District of California

impeachment purposes since it took place nearly 20 years ago and there was no
evidence Griffin had not led a law-abiding life since that time. At the court's request,
defense counsel summarized Griffin's expected testimony, and explained that its
relevance was "just to establish . . . there was contact between [defendant] and
[Caldwell] . . . in the days leading up to the incident." Finding Griffin's credibility
was going to be "in some respect at issue," the court allowed the impeachment
evidence to be used, but provided the felony would be described as a "theft-related
offense with no detail . . . other than that." To preempt the issue at trial, defense
counsel asked Griffin near the conclusion of his direct testimony if he had suffered a
felony conviction for a theft-related offense in 1989, to which Griffin answered
affirmatively.

In his closing argument, the prosecutor introduced his discussion of the moving
incident testified to by Griffin and defendant as follows: "Now, whether you believe
this incident or not, it's not really material to your finding, I don't think. But I think
their testimony is incredibly highly suspicious." Before going on to discuss the
testimony, the prosecutor referenced the impeachment evidence once, as follows:
"Let's talk about [Griffin]. He's the first defense witness. We know he's a felon."
The prosecutor went on to question Griffin and defendant's entire story about the
October 22 moving incident by pointing out certain highly implausible aspects of it:
(1) the two men would have had to go completely out of their way and greatly
lengthen their trip in order to have run into Caldwell in downtown Oakland; (2)
although it would take four trips to move all of Griffin's belongings, they left the
truck empty enough on the first trip that there was room in the front and back seats
for Caldwell and Griffin to both have seats; and (3) despite not having begun the
move until 7:30 or 8:30 in the evening, Griffin let defendant drive Caldwell home and
leave him sitting alone in the truck for one hour and ten minutes while Caldwell and
defendant socialized outside her apartment. The prosecutor characterized this as "the
most bizarre, unusual moving pattern I have ever heard."

Ex. F at 17-18.

The state court assumed without deciding that Griffin's twenty-year old conviction was too remote in time to constitute proper impeachment material but, nevertheless, denied the claim because Petitioner had failed to show that he was prejudiced by this error. *Id.* at 18-20.

  2. <u>Federal Authority</u>

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant

18

United States District Court

For the Northern District of California

1   pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary

2   to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

3          Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for

4   granting federal habeas relief on due process grounds. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th

5   Cir. 1999); *Jammal*, 926 F.2d at 919. Although adherence to state evidentiary rules suggests that the

6   trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even

7   when state standards are violated; conversely, state procedural and evidentiary rules may

8   countenance processes that do not comport with fundamental fairness. *Id.* The due process inquiry

9   in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it

10  rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995);

11  *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).

12         3.    <u>Analysis</u>

13         Although the trial court assumed that the twenty-year old conviction was improper

14  impeachment material, it did not indicate whether it was relying on state evidentiary or federal

15  constitutional authority in doing so. Under the federal authority cited above, no constitutional error

16  occurred because the theft-related felony was relevant to the witness's credibility. *See Jammal*, 926

17  F.2d at 920 (only if there are no permissible inferences that jury may draw from evidence can its

18  admission violate due process). Although the fact that Griffin led a legally blameless life for twenty

19  years thereafter may reduce the probative value of the conviction regarding his credibility, the

20  relevance itself does not vanish.

21         Furthermore, even if a due process violation occurred, Petitioner cannot show that he was

22  prejudiced. On habeas review, the standard for determining prejudice is whether the constitutional

23  violation had a substantial and injurious effect or influence in determining the jury's verdict. *See*

24  *Brecht*, 507 U.S. at 637.

25         Petitioner argues that Griffin's impeachment had a substantial influence on the verdict

26  because he was a key witness who provided corroboration of Petitioner's heat of passion defense.

27  Petitioner explains that the defense theory was that, in the months leading up to Caldwell's killing,

28  he harbored romantic feelings for her and wanted to reconcile with her. After speaking pleasantly

United States District Court

For the Northern District of California

1    with his wife for about an hour two days prior to the killing, Petitioner believed that they would get

2    back together.  Petitioner bought his wife an expensive bracelet and wrote her love notes begging

3    her to take him back.  These hopes were crushed two days later, when he was with his wife in his car

4    and she threw the bracelet back at him and called him a "dog ass motherfucker."  Pet'n at 21-22.

5    Petitioner argues that Griffin's testimony was important because he was the only party who could

6    confirm Petitioner's testimony that he ran into his wife two days prior to the offense, that his wife

7    willingly got into his truck with him, and that Petitioner looked happy after this meeting.  *Id.* at 22.

8    However, Petitioner's prejudice argument is belied by the evidence.

9           The record contains only two brief references to Griffin's prior conviction–his own

10   admission that he suffered it in 1989, RT at 299, and the brief mention by the prosecutor in his

11   closing statement, "We know [Griffin] is a felon," RT at 447.  And, as pointed out by the Court of

12   Appeal, Petitioner and Griffin's version of Petitioner's encounter with Caldwell two days prior to

13   the killing had inherent credibility problems.  First, it was unlikely that Petitioner would begin

14   helping Griffin make a move that required multiple trips beginning between 7:30 and 8:30 pm.  RT

15   at 295, 300.  Second, although they started late and the move required multiple trips, they did not

16   take the most direct route from Griffin's old residence to his new residence.  RT at 301.  Third, they

17   interrupted the first trip so that Petitioner could visit with Caldwell for seventy minutes in her

18   residence while Griffin waited for him in the car downstairs.  RT at 298-99.  Fourth, and most

19   important, any relevance of Griffin's testimony to Plaintiff's optimistic state of mind regarding

20   reconciling with Caldwell was neutralized by the testimony of Petitioner's friend, Reginald Allen,

21   who said that, in the hours immediately preceding the killing, Petitioner was upset and complaining

22   nothing was going well for him.  RT at 154, 156.

23          Also, overwhelming evidence showed that Petitioner acted out of malice.  Evidence showed

24   that Petitioner had been attempting to contact Caldwell prior to the killing.  He had followed her to

25   her place of work and to a BART station in April and May 2008.  Caldwell's son and boyfriend

26   testified that Petitioner repeatedly attempted to contact her at her residence.  It was undisputed that

27   Caldwell had obtained a restraining order against him and had called the police on October 6, when

28   Petitioner approached her at a bar.  Caldwell agreed to see Petitioner on the day she was killed only

United States District Court

For the Northern District of California

because she was concerned about Petitioner's mental state, not because she was interested in reconciling with him.  Thus, Petitioner's version that Caldwell welcomed contact with him and that she fed his hope for reconciliation was based on his own testimony and, in the case of Griffin's testimony, on a highly improbable version of events.  This evidence, plus the physical evidence that Petitioner had placed his knife at Caldwell's neck before stabbing her, that he stabbed her repeatedly and then threw her out of his truck and quickly drove away from scene of the crime is strong evidence that Petitioner acted out of malice.

Furthermore, the only evidence that Caldwell rebuffed Petitioner's gift and called him "a dog ass motherfucker" is Petitioner's own testimony.  Petitioner's credibility had been placed in question by evidence that he lied to the police when he told an officer that he did not know where Caldwell lived or her phone number.  RT at 141, 336-37.  During his cross-examination, the fact that he could remember detailed information about some of the events that occurred on October 25, 2008, but had no memory of other events also raised credibility issues.  RT at 380-94.  The jury easily could have not believed Petitioner's version of a "sudden quarrel" started by Caldwell.

That Griffin was impeached with a prior felony had little to do with the jury's rejection of Petitioner's heat of passion defense.  There was more than sufficient evidence for the jury to have found that Petitioner killed Caldwell out of malice and not out of heat of passion, even if it had found Griffin's testimony to be credible.

Based on the evidence presented at trial, any error in permitting the prosecution to impeach Griffin with a twenty-year old felony conviction did not have a substantial or injurious effect on the jury's verdict.  Accordingly, habeas relief on this claim is denied.

C.    Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of trial counsel based on twelve instances of counsel's deficient performance.  Petitioner presented these claims to the California Supreme Court in his petition for a writ of habeas corpus, which the court rejected without comment. Therefore, this Court conducts an independent review of the record to determine whether the state-court decision was an objectively unreasonable application of clearly established federal law.  *See Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

1.          Federal Authority

       A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

       In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687–88. In other words, to demonstrate deficient performance, a petitioner is required to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

       The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *Id.* at 1410–11. The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S. Ct. at 788.

**United States District Court**
For the Northern District of California

2.     <u>Subclaim 1 – Counsel Failed to Perform Duties in Written Agreement</u>

Petitioner claims counsel failed to perform his legal duties set forth in the written fee agreement that he attaches as Exhibit B to his petition.  Paragraph six of the fee agreement provides, "Attorney will . . . keep Client informed of progress and developments, and respond promptly to Client's inquiries."   Petitioner does not elaborate on this claim nor give examples of when or how counsel did not respond promptly or keep him informed of developments.  This claim fails because conclusory allegations of ineffectiveness not supported by specifics do not warrant relief.  *Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995).  The California Supreme Court's denial of this claim was not objectively unreasonable.

3.     <u>Subclaim 2 – Counsel failed to Investigate Victim's Phone Call History</u>

Petitioner contends that counsel was ineffective for failing to present evidence of Caldwell's phone call history which would have shown that she contacted Petitioner, even though she had obtained a restraining order against him.  He contends that this evidence would have rebutted the prosecution's theory that he harassed Caldwell.  Petitioner attaches as Exhibit C to his petition a declaration from George Parsons, Custodian of Records of MetroPCS which indicates that he received a subpoena for certain records which existed at one time but "all or some of them have since been purged."

Respondent argues that this claim fails because Petitioner does not show that he put counsel on notice to investigate the victim's phone records.  However, in his traverse, Petitioner clarifies that the Parsons' declaration was given to him by his counsel which, he argues, shows that counsel was on notice that Caldwell's phone records might be exculpatory.

Petitioner's clarification shows that counsel attempted to obtain Caldwell's phone records, but the response he received from the phone company indicated that they were not available.  Counsel cannot be faulted for doing exactly what Petitioner would have him do.  Therefore, Petitioner has not shown that counsel was ineffective.  The California Supreme Court's denial of this claim was not objectively unreasonable.

United States District Court

For the Northern District of California

4.     <u>Subclaim 3 – Failure to Present Evidence of Petitioner's Alcohol Addiction</u>

Petitioner argues counsel was ineffective for failing to present evidence of Petitioner's alcohol addiction.  Respondent argues that the claim fails because Petitioner does not present evidence that counsel was put on notice to explore alcohol addiction.  In his traverse, Petitioner clarifies that counsel was aware of his alcohol addiction because, during voir dire, he asked potential jurors if they were comfortable hearing evidence of alcohol abuse and the judge mentioned to the jurors that alcohol addiction might be argued during the trial.

Petitioner's clarification shows that counsel was aware that there was a possible defense of alcohol addiction but, because counsel did not submit evidence of this at the trial, he likely made a decision that this defense would not be beneficial to Petitioner.  That counsel made a deliberate choice to avoid a defense of alcohol addiction is supported by his statement in his closing argument that, for the jury to find that Petitioner acted out of heat of passion, it was not required "to go to the depths of some alcoholic on a binge that's lost his mind."  RT at 496.  *See United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991) (defendant must overcome strong presumption that counsel's conduct falls within wide range of reasonable professional assistance which, under the circumstances, might be considered sound trial strategy); *United States v. Mayo,* 646 F.2d 369, 375 (9th Cir. 1981) (difference of opinion as to trial tactics does not constitute denial of effective assistance); *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984) (tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available).  Accordingly, the California Supreme Court's denial of this claim was not objectively unreasonable.

5.     <u>Sub-claims 4-7 and 10-12 – Failure to Present Mental Health Defense</u>

Petitioner argues that counsel failed to: (1) investigate and prepare a mental health defense; (2) prepare a psychologist or other expert witnesses to present evidence of a mental health defense; (3) respond to Petitioner's request to investigate his ongoing sleep deprivation and its effects on his ability to think clearly; and (4) argue to the jury about Petitioner's panic attacks.

The state statutes pertaining to a mental health defense are California Penal Code sections 28(a) and 29.  California Penal Code section 28(a) provides:

1         Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show
2  or negate the capacity to form any mental state, including, but not limited to, purpose, intent,
   knowledge, premeditation, deliberation or malice aforethought, with which the accused
   committed the act.  Evidence of mental disease, mental defect, or mental disorder is
3  admissible solely on the issue of whether or not the accused actually formed a required
   specific intent, premeditation, deliberated, or harbored malice aforethought, when a specific
4  intent crime is charged.

5  Cal. Penal Code § 28(a).

6         California Penal Code section 29 provides that any expert testifying about a defendant's

7  mental disorder or defect may not testify as to whether the defendant had the required mental state

8  for the crimes charged; that question must be decided by the trier of fact.

9         The following evidence pertains to this claim.  At trial Petitioner testified to the following.

10  Starting in October 2008, Petitioner's wages were garnished by the Internal Revenue Service to

11  satisfy owed back income taxes.  RT at 347.  After the garnishment went into effect, Petitioner could

12  no longer pay the rent for his apartment.  RT at 348.  He had to move out of his apartment and

13  became homeless.  Id.  He slept in his truck or on a friend's couch.  Id.  Petitioner started losing a lot

14  of sleep over this situation.  RT at 349.  He was worried and scared.  Id.  Petitioner's good friend

15  Tommie Larkin testified that, after Petitioner had to move out of his apartment, he noticed that

16  Petitioner was anxious, angry, confused and depressed.  RT at 312.

17         In counsel's closing argument to the jury, he argued that Petitioner acted in the heat of

18  passion and that part of this reaction was due to the fact that he was under extreme stress in the

19  months preceding the offense .  RT at 488, 493-99.  He told the jury:

20         Tommie Larkin testified that Robert's state of mind during that period of time, those couple
   of weeks in October, was one of anxiety, it was one of anger, it was of confusion and
21  depression. . . . He was angry and depressed because he had personal issues.  What were his
   personal--what were Robert's personal issues at that time?  Homeless.  Transient. . . . the IRS
22  was taking enough money out of Mr. Woods' paycheck that he was unable to maintain a
   home. . . .  So it doesn't require, you know, an act of imagination to understand the stress, the
23  depression or anger that may arise in connection with something pertaining to your taxes.

24  RT at 483-84.

25         Counsel used the fact that Petitioner was under stress from objective factors, but not mentally

26  incapacitated, to support his heat of passion argument.  Counsel stated to the jury:

27         I'm not asking you to dance on the mind of a schizophrenic or some sociopath.  You're not
   being asked to go to the depths of some alcoholic on a binge that's lost his mind.  You don't
28

United States District Court

For the Northern District of California

have to get into the subjective mind to understand the things that were going on.  These are objective realities, completely.

RT at 496-97.

Although counsel made a strong closing argument that Petitioner's emotional distress from situational factors contributed to his state of mind that led to his killing Caldwell in a heat of passion, Petitioner contends counsel should have included a defense that Petitioner was suffering from a mental illness, defect or disorder.  Petitioner offers two documents to support his argument that counsel should have known that Petitioner was suffering from a mental illness, defect or disorder and, thus, was ineffective for failing to put on this defense.  However, the two documents do not support Petitioner's claim.

The first document is a May 12, 2012 letter from forensic psychologist Paul Good addressed to Petitioner.  In the letter, Dr. Good states:

> I received your letter requesting information relating to "the scope and description of mitigating evidence."  I understand what it is you are requesting from me, but I want to explain why I have hesitated to provide the information.
>
> When I spoke with Mr. Gene Vorobyov, I informed him that I could provide him with some mitigating testimony at sentencing.  That would reflect a description of your background and history, psychological difficulties, the substance abuse that caused problems in your life, and other aspects of your history that would help explain why you engaged in the alleged offenses.  So, the only data that I have is the basic information that you provided to me during our interview and testing.  The information in and of itself does not convey the mitigation.  It would have to be my drafting of a report that would utilize the information to present a compassionate picture of your life.  As you know, I never was asked to write a report so none exists.

Traverse, Ex. B.

In his traverse, Petitioner indicates that although Dr. Good references Mr. Gene Vorobyov, Petitioner's appellate attorney, he was actually referring to Petitioner's trial attorney, Mr. William Welch.  Trav. at 40.  Taking Petitioner's statement as true, Dr. Good's letter shows that counsel hired Dr. Good to interview and examine Petitioner presumably to explore the possibility that he would testify about Petitioner's mental state.  Thus, contrary to Petitioner's allegations, counsel did investigate Petitioner's mental state.  The letter itself discusses Dr. Good's report as offering mitigating testimony at sentencing.  It says nothing about offering testimony regarding a mental defect or illness at the guilt phase of the trial that might negate the mental state of malice.  Petitioner

United States District Court

For the Northern District of California

makes much of the fact that Dr. Good states that he would present a "compassionate picture of Petitioner's life." Whether Petitioner's life would engender compassion might be relevant at the sentencing phase of his trial, but it was not relevant to the jury's determination regarding whether Petitioner actually formed the mental state of malice at the time he killed Caldwell. Furthermore, Dr. Good's response may have convinced counsel that Dr. Good's testimony would not have aided Petitioner. This letter provides no support for Petitioner's theory that it proved counsel knew that Petitioner suffered from a mental illness, defect or disorder and should have put on expert testimony.

The second document Petitioner presents is an August 22, 2008 emergency room medical report diagnosing Petitioner with "panic attacks" due to social and financial situational stresses. Trav., Ex. A. The emergency room doctor noted that Petitioner was alert, awake, in no obvious significant distress, pleasant, talkative, somewhat emotional and tearful occasionally. The doctor further noted that Petitioner's symptoms of anxiety and panic "are quite situational and tend to be aggravated by his thinking about his social and money situation. He does not show any obvious signs of major depressive disorder." The doctor encouraged Petitioner to seek "financial counseling and financial help to help him through this situation." Thus, the emergency room report corroborates counsel's theory that Petitioner was suffering from emotional distress caused by significant objective social and financial stressors. However, this document offers no evidence that Petitioner suffered from a mental defect, disorder or illness that would have negated his mental state of malice at the time of the killing.

Because no evidence showed counsel that Petitioner suffered from a mental illness, defect or disorder sufficient to constitute a defense, counsel's performance could not have been deficient for failing to put on such a defense.

In his supplemental traverse, Petitioner cites three death penalty cases, *Wiggins v. Smith*, 539 U.S. 510, 523-34 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000) and *Daniels v. Woodford*, 428 F.3d 1181, 1203-04 (9th Cir. 2005), for the proposition that counsel should have investigated because the facts known to counsel suggested that Petitioner had a mental disease, defect or disorder. See Mot. to Supp. Trav. at 2. These cases do not support Petitioner's claim. First, they each addressed counsel's performance in presenting mitigating evidence during the sentencing phase

United States District Court

For the Northern District of California

1    of a capital murder trial.  *See e.g. Williams*, 529 U.S. at 395-96 (counsel was competent during guilt

2    phase, but representation fell short during sentencing phase).  Therefore, counsel's performance in

3    these cases was judged in accordance with the standards for capital defense work articulated by the

4    American Bar Association.  *Wiggins*, 539 U.S. at 524.  These standards are not relevant to

5    Petitioner's non-capital case.

6         Second, in each of these cases, defense counsel knew that his client may have suffered from

7    mental illness, but did not follow up on the information.  *See Daniels*, 428 F.3d at 1203-05 (although

8    counsel believed Daniels may have suffered from paranoia and schizophrenia, he did little to

9    investigate Daniels's mental health); *Wiggins*, 539 U.S. at 523 (psychologist report showed

10   petitioner had IQ of 79, difficulty coping with demanding situations and exhibited features of

11   personality disorder); *Williams*, 529 U.S. at 396 (evidence showed petitioner was "borderline

12   mentally retarded," did not advance beyond the sixth grade, his parents were imprisoned for criminal

13   neglect of petitioner and his siblings, he lived in an abusive foster home, and was returned to his

14   abusive parents when they were released from prison).

15        Even if these capital cases applied to Petitioner's case, they are distinguishable on the ground

16   that Petitioner's record did not inform counsel that Petitioner suffered from a mental disorder, defect

17   or illness.  Further, as indicated by Petitioner, it appears that counsel in fact explored Petitioner's

18   mental health by hiring Dr. Good and may have been dissuaded from using a mental health defense

19   by Dr. Good's response.  As discussed previously, the evidence showed, and counsel argued to the

20   jury, that Petitioner was suffering from emotional distress, confusion and depression from objective

21   situational factors but chose not to advance a mental health defense.

22        The decision to advance only a heat of passion defense was a tactical decision of trial

23   counsel which deserve deference when: (1) counsel in fact bases trial conduct on strategic

24   considerations;

25   (2) counsel makes an informed decision based upon investigation; and (3) the decision appears

26   reasonable under the circumstances.  *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

27   Federal courts should not overlook the "wide latitude counsel must have in making tactical

28   decisions;" therefore, there are no "strict rules" for counsel's conduct "[b]eyond the general

United States District Court

For the Northern District of California

requirement of reasonableness." *Cullen*, 131 S. Ct. at 1406-07.  As the Supreme Court has stated, there are "countless ways to provide effective assistance in any given case. . . . Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach.  It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it." *Harrington*, 131 S. Ct. at 788-89.

Counsel's closing argument is evidence that he made a tactical decision that a heat of passion defense had the best chance of persuading the jury that Petitioner lacked the mental state of malice when he killed Caldwell.  As noted above, part of counsel's argument for heat of passion included that Petitioner was mentally unstable in the months preceding the offense.  In order to enlist the jury's identification with Petitioner's plight, it is reasonable to conclude that counsel decided to argue that Petitioner faced familiar life stressors, like problems with the IRS, rather than the fact that Petitioner was suffering from a mental illness.  To argue Petitioner had a complete mental health defense where there was no good evidence to support such argument could have compromised the credibility of the defense.  Counsel cannot be faulted if his ultimate choice of defense did not convince the jury to find Petitioner guilty of manslaughter rather than murder.  *See Bashor*, 730 F.2d at 1241 (tactical decisions do not constitute ineffective assistance simply because, in retrospect, better tactics are known to have been available).

Furthermore, even if counsel's performance was deficient, Petitioner fails to show prejudice.  Petitioner merely speculates that an expert would have testified favorably for the defense, but does not indicate what the expert would say.  That omission is particularly telling in view of the unhelpful nature of the letter from Dr. Good.  Speculation about what an expert would say is insufficient to establish prejudice.  *See Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009) (petitioner's argument that further tests would show childhood illnesses were potential cause of brain dysfunction relied on speculation which is insufficient to establish prejudice); *Gonzalez v. Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008) (petitioner's speculation that, if tests had been done, they might have shown evidence of brain damage insufficient to establish prejudice).  Furthermore, in view of the substantial and corroborated testimony about the stress Defendant was experiencing, it is highly

United States District Court
For the Northern District of California

1    unlikely that the August 22, 2008 emergency room report would have made a difference.  Thus,

2    Petitioner fails to show that there is a reasonable probability that, but for counsel's deficient

3    performance, the result of the proceeding would have been different.

4         Accordingly, the California Supreme Court's denial of the ineffectiveness claims based on

5    the failure to present evidence of a mental health defense was not objectively unreasonable.

6         6.    <u>Subclaims 8 and 9 – Failure to Investigate and Present Character Witnesses</u>

7         Petitioner claims that counsel was ineffective for failing to investigate and present character

8    witnesses and for failing to respond to Petitioner's request that he interview Petitioner's long time

9    co-workers who had knowledge of his mental state.

10        This claim fails because Petitioner has not provided evidence that these witnesses would

11   have testified, nor has he provided evidence about what testimony these character witnesses would

12   have provided.  Failure to provide such evidence – such as declarations from the witnesses

13   themselves – precludes this claim of ineffective assistance.  *See Matylinksy v. Budge*, 577 F.3d 1083,

14   1096–97 (9th Cir. 2009); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000).

15        Accordingly, the California Supreme Court's denial of the ineffectiveness claims based on

16   the failure to present character witnesses was not objectively unreasonable.

17   D.    <u>Trial Court's Failure to Dismiss Entire Jury Panel or Conduct Further Voir Dire</u>

18        Petitioner claims that Prospective Juror No. 57's statement that she did not believe that a

19   person could hurt another in a "fit of passion" tainted the entire jury panel and the trial court had the

20   duty to dismiss the entire panel or to conduct further voir dire to ascertain the impact of Juror No.

21   57's statement on the other jurors.  Petitioner presented this claim in his habeas petition to the

22   California Supreme Court, which was denied without comment.  Therefore, this Court must

23   independently review the record to determine if the state court's denial of this claim was objectively

24   unreasonable.  *See Himes*, 336 F.3d at 853;  *Harrington*, 131 S. Ct. at 784.

25        In support of this claim, Petitioner cites *Skilling v. United States*, 130 S. Ct. 2896, 2917-25

26   (2010).  In *Skilling*, the Supreme Court rejected the defendant's claims that the trial court did not

27   adequately question jurors regarding possible bias from pretrial publicity.  *Id.* at 2918-19.  In so

28   holding, the Court noted that "no hard-and-fast formula dictates the necessary depth or breadth of

voir dire. . . . Jury selection . . . is particularly within the province of the trial judge." *Id.* at 2917-18 (internal citations omitted).  In rejecting the defendant's claim that voir dire was insufficient, the Court reviewed the trial court's procedure which included examining each prospective juror individually to prevent the spread of any prejudicial information to other venire members and, to encourage candor, repeatedly admonishing the jurors that there were no right and wrong answers to the questions.  *Id.* at 2919.

Though *Skilling* examined in detail the extensive voir dire the trial court undertook to ascertain juror bias from pre-trial publicity, it does not support Petitioner's claim that the jurors in his case should likewise have been examined.  Rather, *Skilling* stands for the proposition that jury selection is particularly within the province of the trial judge.  It does not stand for the proposition that a trial court has a constitutional duty to dismiss a jury panel or to probe prospective jurors for bias when one prospective juror is excused for cause after expressing the view that she did not believe in a heat of passion defense.

In this case, after Juror No. 57 was excused, the trial court considered defense counsel's request to question the prospective jurors more thoroughly on their feelings about the heat of passion defense.  The court stated, in relevant part:

> The heat of passion is a term of art.  And I think . . . if you asked anyone of the people in this audience what heat of passion meant you would get that many answers to what that meant.  And none of them would be the correct legal definition of it. . . . Voir dire is not . . . the appropriate time to instruct [the jury] on the law. . . . The obligation of the jury is to follow the law as the Court states it to them.  I believe that is the proper inquiry to ask them--will they follow the law, even though they may disagree with it? . . . . There are many laws that people do disagree with but they will follow it because they believe in the structure and the system.

Jury Voir Dire RT at 378-79

Therefore, the trial court in Petitioner's case considered counsel's request to further voir dire the jurors regarding any bias to a heat of passion defense and provided good reasons for rejecting it.  No case cited by Petitioner holds that a trial court must undertake the type of further questioning he posits or must dismiss the entire jury panel because one juror cannot follow one area of the law.

Accordingly, the California Supreme Court's rejection of this claim was not objectively unreasonable.

United States District Court

For the Northern District of California

E.      Motion for Evidentiary Hearing

        Petitioner, citing *Hendricks v. Vasquez*, 974 F.2d 1099 (9th Cir. 1992), argues he is entitled to an evidentiary hearing because his "allegations, if proved, would entitle him to relief and the state court has not, after a full and fair hearing, found the relevant facts."  He further argues that he is entitled to a hearing because, with the exception of his direct appeal, no hearing was afforded him on the claims raised in this motion.  However, Petitioner bases his argument on pre-AEDPA cases.

        Before the enactment of the AEDPA, the decision concerning an evidentiary hearing with respect to a habeas petition was firmly committed to the discretion of the district courts, subject to some judicially-created limitations on that discretion.  *See Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999).  The amendments contained in the AEDPA, by contrast, impose an express limitation on the power of a federal court to grant an evidentiary hearing and have reduced considerably the degree of the district court's discretion.  Under AEDPA, an evidentiary hearing is held in federal habeas cases only under the most limited circumstances.  *Id.* at 1077-79.  The amended habeas statute now provides that a district court may not hold an evidentiary hearing on a claim for which the petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

        In his motion, Petitioner does not indicate which claims warrant an evidentiary hearing.  Because Petitioner received a hearing on direct review, he is presumably requesting an evidentiary hearing on the claims he asserted in his petition for a writ of habeas corpus in the California Supreme Court.  The claims asserted in that petition that are relevant here are ineffective assistance of counsel and a violation of his Sixth Amendment right to an impartial jury.  Petitioner does not indicate what evidence he would present regarding these claims.  He merely states that, "either the respondent will conceded [sic] the truth of petitioner's factual allegations or they will dispute them.

United States District Court

For the Northern District of California

At that time, a factual dispute will exist.  That factual dispute will require an evidentiary hearing.  A hearing in a habeas proceeding is mandatory whenever facts are in dispute and the habeas applicant did not receive a full and fair evidentiary hearing in state court."  Petitioner submitted the identical motion with his habeas petition to the California Supreme Court.

Petitioner's argument does not meet the requirements of 28 U.S.C. § 2254(e)(2).  Petitioner cites no new rule of constitutional law or factual predicate that could not have been discovered through due diligence.  Nor does he cite facts underlying the claim from which a reasonable trier of fact would have found him not guilty of the underlying offense, but for the constitutional error.  Petitioner's argument that an evidentiary hearing is required whenever facts are in dispute is belied by his motion which cites no facts at all, let alone facts that are in dispute.  Because Petitioner submitted this same meritless motion to the California Supreme Court, it does not constitute the diligence necessary to develop the factual basis of the claim in state court.  *See Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000) (a prisoner "fails" to develop the factual basis of a claim, triggering § 2254(e)(2), if "there is lack of diligence . . . attributable to the prisoner or the prisoner's counsel").

Petitioner has failed to show that he acted with due diligence in attempting to develop the facts in state court and he has failed to satisfy the requirements of § 2254(e)(2).  Accordingly, the motion for an evidentiary hearing is denied.

## IX.   CONCLUSION

Based on the foregoing, the Court orders as follows:

1.       The petition for writ of habeas corpus is **DENIED** on the merits.  A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

2.       Petitioner's motion for an evidentiary hearing is **DENIED**.  Doc. no. 21.

///

///

///

3.       Petitioner's motions for an extension of time to file his traverse, to amend his petition, to file an oversize traverse and to supplement his traverse are **GRANTED**.  Doc. nos. 15 - 17, and 24.

4.       The Clerk shall enter a separate judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

Dated:  March 5, 2014

_____
EDWARD M. CHEN
United States District Judge